IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 7-ELEVEN, INC.,<br>          **Plaintiff,**<br><br>   **v.**<br><br>MILIND L. UPADHYAYA, MINAXI M.<br>UPADHYAYA, MINAXI ENTERPRISES,<br>INC., GIRMA GASISA and GETACHEW<br>AYANA,<br>          **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 12-5541** |

**DuBois, J.**                                                            **March 1, 2013**

## M E M O R A N D U M

## I.      INTRODUCTION

Plaintiff 7-Eleven, Inc. ("7-Eleven") seeks a permanent injunction against defendant

owners and employees of one of its franchises in Philadelphia, Pennsylvania.   7-Eleven asks the

Court to order franchisee-defendants[1] to surrender the store to 7-Eleven and to eject them from the

premises.

Presently before the Court is 7-Eleven's Motion for a Mandatory Preliminary Injunction.

By agreement of the parties, the Court treats that Motion as a Motion for Permanent Injunction.

The Court conducted a 4-day hearing on the Motion for Permanent Injunction on

December 11-14, 2012.[2]   Based on the evidence presented at the hearing, the Court concludes that

franchisee-defendants breached their Franchise Agreement by systematically defrauding 7-Eleven

---

1  The Court sometimes refers to Milind and Minaxi Upadhyaya, and Minaxi Enterprises, Inc. collectively as "franchisee-defendants."

2  The Court notes that there is no jury demand in this case and the Court may therefore decide 7-Eleven's equitable claims prior to a determination of any legal claims.   Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959).

for at least a period of several months. This fraud was accomplished by defendants' actions in concealing sale proceeds from 7-Eleven, either by selling merchandise without recording it on the cash register, or by using certain register keys to mask such sales. 7-Eleven therefore properly terminated the Franchise Agreement without any notice and opportunity to cure as of September 28, 2012. 7-Eleven has demonstrated success on its claims of trademark infringement as defendants continue to engage in unauthorized use of 7-Eleven's trademarks in a manner likely to confuse consumers. Upon consideration of the relevant equitable factors, the Court determines that a permanent injunction should issue for the reasons discussed below, and the Court grants plaintiff's Motion for a Permanent Injunction.

## II.     FINDINGS OF FACT

Having reviewed the submissions of the parties and conducted a hearing on December 11-14, 2012, the Court makes the following findings of fact:

A.     <u>Parties</u>

1.     7-Eleven is a Texas corporation, duly authorized to do business within the Commonwealth of Pennsylvania. 7-Eleven is one of the largest convenience store franchise systems in the United States. 7-Eleven operates, franchises, and licenses approximately 9,200 stores in North America. (Parties' Uncontested Facts, at ¶1-2.)

2.     Defendant Minaxi Enterprises, Inc. ("Enterprises") is a Pennsylvania corporation. It is a citizen of the Commonwealth of Pennsylvania. (<u>Id.</u> at ¶3.)

3.     Defendant Milind L. Upadhyaya ("Milind") is a citizen of the Commonwealth of Pennsylvania. He is the President and a shareholder of Enterprises. (<u>Id.</u> at ¶4.)

4.     Defendant Minaxi M. Upadhyaya ("Minaxi") is the wife of Milind and a citizen of the Commonwealth of Pennsylvania.   She is the Treasurer and a shareholder of Enterprises.   (Id. at ¶5.)

5.     On June 1, 2004,[3] Milind and Minaxi entered into a Store Franchise Agreement (the "Franchise Agreement"), which superseded a franchise agreement effective May 10, 1993. Pursuant to the Franchise Agreement, among other things, 7-Eleven leased (or subleased) to Milind and Minaxi certain equipment and real property presently described as 7-Eleven Store No. 2408-25065C located at 106 S. 38th Street, Philadelphia, Pennsylvania 19104 ("franchisee-defendants' store").   The Franchise Agreement was immediately assigned to Enterprises, and Minaxi and Milind guaranteed the performance of Enterprises' under the Franchise Agreement.   (Id. at ¶32.)

6.     Defendants Girma Gasisa and Getachew Ayana are citizens of the Commonwealth of Pennsylvania.   They are both employed as sales associates at the Store.   (Id. at ¶¶6-7.)

B.     Relevant Portions of the Franchise Agreement

7.     The Franchise Agreement provides that Milind, Minaxi, and Enterprises were required to, inter alia, use electronic equipment to scan all products which can be scanned, report all sales to 7-Eleven, and otherwise provide 7-Eleven with truthful, accurate and complete information regarding operation of the store.   (Franchise Agreement, at ¶¶12(c)(3), 19(f), 23(d)(4)).

8.     The Franchise Agreement provides that in the first event of certain material breaches, franchisees are entitled to a period of notice and opportunity to cure prior to termination of the Agreement.   The only exception is for a violation of "any of the Anti-Terrorism Laws,"

---

3 This is the date included in the Parties' Uncontested Facts.   However, the Franchise Agreement itself is dated May 4, 2004.   The difference in dates is of no legal significance.

which the Agreement states will result in an immediate termination with no right to cure. (Id. at ¶26(a)(7).)

C.    7-Eleven Franchise System

9.    Under the current and prior forms of the franchise agreement, a franchisee leases the store and equipment, and is licensed to use the 7-Eleven® Service Mark, related trademarks, trade dress, and system of operations.   A franchisee does not acquire ownership of the store, its premises, or any of the physical plant, all of which remain the property of 7-Eleven.   Rather, the franchisee's primary ongoing financial interest is in the net income derived from the store's operations, which the franchisee draws against on a weekly basis.   (Parties' Undisputed Facts, at ¶11.)

10.    7-Eleven's essential financial interest is in receiving a percentage of the "gross profit" (net sales less cost of goods sold) derived from operation of the Store, which percentage is designated in the franchise agreement as the "7-Eleven Charge." (Id. at ¶12.)

11.    Under 7-Eleven's franchise system the 7-Eleven charge is 52 percent of gross profit if less than 85 percent of the product in the store is purchased from vendors designated as recommended by 7-Eleven.   If over 85 percent of store product is purchased from recommended vendors, the charge is 50 percent.   Pursuant to these requirements, 7-Eleven's share of the Store's gross profit was 52 percent until approximately April, 2012, when it was reduced to 50 percent. (Hearing Transcript, December 11, 2012, at 46) ("H1.")

12.    The net income in which franchisee-defendants have an interest is the amount remaining after deducting both "operating expenses" (such as payroll and similar expenses) and the 7-Eleven Charge from the gross profit.   (Parties' Undisputed Facts, at ¶12.)

13.     7-Eleven utilizes a Point-of-Sale ("POS") register system that simultaneously records all transactions on what is commonly referred to as an electronic journal which is accessible by 7-Eleven. Using the POS register system, merchandise purchased by a customer is electronically scanned, its price appears on the register, the cash tendered by the customer is recorded, a register drawer opens, and the customer is given the change from his or her purchase, following which the register drawer is closed.   (Id. at ¶31.)

14.     The cash registers – there are usually two in each store – track sales by product and time of day and feed that data to an in-store processor.   Store managers know when they are selling what, and can tailor the product mix to their clientele. The in-store processor is shared with 7-Eleven over a dedicated network.   (Id. at ¶29.)

15.     With respect to sales and receipts of the store, franchisees are obligated to submit a Daily Cash Report each day and make daily deposits of receipts into a designated 7-Eleven bank account. The franchisee is required by the franchise agreement to deposit each day's cash receipts into a designated bank account no later than the following day. The Daily Cash Report states the amount of sales for the day as recorded or rung up on the cash register, sales made by credit card, and sales of money orders. The Daily Cash Report also accounts for and records any deductions to or from cash that affects the daily deposit.   (Id. at ¶18.)

16.     The Daily Cash Report is prepared and electronically submitted to 7-Eleven by the franchisee (or the franchisee's employee) and is the only means used to report daily sales and account for all receipts.   Information in the Daily Cash Report is entered into 7-Eleven's computerized accounting records upon receipt of the report by the accounting department.   (Id. at ¶19.)

D.    Inaccurate Reporting of Sales/Purchases

17.    Inaccurate or false reporting harms 7-Eleven by, inter alia, depriving it of its full share of gross profit, causing franchises to look less attractive for potential franchisees, and imposing potential liability for understatement of taxes.   (Plaintiff's Proposed Findings of Fact, at ¶27.)

18.    It is possible for franchisees and employees to make false entries in the POS cash register to mask actual sales transactions. For example, they can use a number of POS keys to open the register drawer, enabling them to accept cash and make change without recording the sale.   As a consequence, 7-Eleven's Asset Protection Department tracks the use of certain "high risk transactions" in stores.   The high risk transactions include the use of the following POS keys: Price Lookup ("PLU"), Void Item, Refund, Cancel Age Verification ("CAV"), Penny Sale, Change Makers, and No Sale. (Id. at ¶35.)

19.    Each of these POS keys has a legitimate usage.   For instance, the PLU key is used to inquire about the price of a product.   When the key is pressed and the product is scanned, the price is displayed on the monitor.   (Id. at ¶38.)

20.    However, it is possible to use each of the "high risk" POS keys to commit fraud. For instance, regarding the PLU key, in a multi-item transaction, a franchisee may scan one or two items legitimately (usually lower priced items), and then use the PLU Inquiry key to scan other items without recording their sale.   Because a part of the sale is being recorded, the register drawer opens and change can be given to the customer from the open register drawer.   (Id.)

E.    Investigation into Franchisee-Defendants' Store

21.    In April 2012, James Pasarella, 7-Eleven's Senior Manager, Asset Protection, began investigating franchisee-defendants' store for possible fraudulent activity.   The

investigation was initiated because Pasarella noted in a POS report that the franchisee-defendants' store reported high use of certain POS keys associated with a risk of fraudulent activity. (H1 at 21-23.)

22.     Pasarella compiled a report analyzing a 90-day period between June 24, 2012 and September 22, 2012, regarding certain POS data for the 480 7-Eleven stores in the "PennJersey Zone," an area covering parts of Pennsylvania and New Jersey. (Id. at 185-86); (Ex. 2.)

23.     In that report, franchisee-defendants' store ranked first in the number of transactions involving PLU inquiries, approximately ten times the PennJersey zone average. Franchisee-defendants' store was ranked second in the number of items scanned using a PLU inquiry, and second in the percentage of transactions involving PLU inquiries. (Ex. 2.)

24.     Franchisee-defendants' store data was also substantially higher than the PennJersey zone average for several other types of "high risk" transactions: Item Voids, Non-Scanned Sales, Cancel Age Verification, No Sale, Change Makers and Penny Sales. (Id.)

25.     According to 7-Eleven's algorithm used to calculate the aggregate risk of fraud based on such POS data, franchisee-defendants' store ranked first out of the 480 stores in the zone. (Id.)

26.     Pasarella additionally conducted numerous "secret shops" of franchisee-defendants' store. Shoppers were sent into the store to purchase certain items while recording the product and the time that it was purchased. Afterwards, Pasarella examined the store's POS data to determine if the sale was recorded correctly. (H1 at 38-39.)

27.     In all, Pasarella organized 18 secret shops and found that in 13 of those instances the product purchased was not recorded properly by the store. (Id. at 40.)

28.     Finally, Pasarella conducted a category-specific audit-to-audit report of

franchisee-defendants' store. Generally, 7-Eleven conducts quarterly audits of franchised stores, counting merchandise at retail value and comparing such merchandise to the inventory purchases and customer sales reported by the store. For purposes of determining the franchisee's financial accountability for shortages, 7-Eleven does not review the audit reports by merchandise category, instead examining the store's financial health by looking to the overall purchases, sales and inventory level. In the quarterly audits of franchisee-defendants' store, Pasarella noted very little discrepancy between the reported sales on the POS, the purchases made to replenish the store's inventory and the final inventory level. (Hearing Transcript, December 12, 2012, at 6, 13) ("H2.")

29.     Pasarella compiled data from a 22-month period, from June 17, 2010 through April 6, 2012, which analyzed differences in reported sales to reported purchases in specific inventory categories. (Id. at 16.)

30.     The report showed that reported purchases of cigarettes in the store exceeded reported sales of cigarettes by over $115,000. In other words, the store was buying far more cigarettes than it reported selling to customers. (Id. at 25.)

31.     The report also demonstrated that sales of certain categories of items were substantially in excess of the number of such items purchased. Specifically, reported sales of candy, non-carbonated beverages, tobacco (not cigarettes), and grill items exceeded reported purchases by approximately $112,000. (Id. at 22.)

F.     Non-Curable Notice of Material Breach and Termination

32.     On September 28, 2012, 7-Eleven issued to franchisee-defendants a non-curable notice of material breach and termination ("Notice of Termination"), describing certain alleged breaches of the Franchise Agreement and terminating the franchise as of the date the Notice of

8

Termination was delivered. (Ex. 6.) Specifically, the Notice stated that due to "intentional" and "fraudulent" activity, such as the high use of certain POS keys and the failed "secret shops," the Franchise Agreement was terminated immediately without any notice or opportunity to cure. (Id.)

33. Following the termination of the Franchise Agreement, franchisee-defendants refused to vacate the Store, and they have continued to operate the store. However, following the Notice of Termination, 7-Eleven shut off the store's lottery machine and removed both the money order machine and the EBT (food stamp) machine from the store. (Hearing Transcript, December 13, 2012, at 9-11) ("H3.")

G. Store Video

34. After the notice of termination on September 28, 2012, 7-Eleven removed a DVR from 7-Eleven's security system at the store. The DVR contains video from June 16, 2012 until September 28, 2012. (H1 at 45.)

35. Pasarella reviewed hundreds of hours of the DVR video, during which he stated that he observed "hundreds and hundreds" of fraudulent transactions. (Id. at 62.) At the hearing, he testified regarding an in-depth review of videotaped transactions which occurred at various times on June 19, June 22, July 1, August 1, August 7, September 1, and September 14, 2012. (Ex. 48-56.)

36. The dates were originally determined by randomly selecting allegedly fraudulent transactions from the DVR footage, and a total of 26 hours from those days was reviewed in-depth by 7-Eleven. (H1 at 104); (Hearing Transcript, December 14, 2012, at 7) ("H4.") Over 900 transactions were examined by 7-Eleven, and 298 were identified as fraudulent. Thus, approximately 33% of all transactions were identified as fraudulent either (1) through use of POS

keys to understate or hide customer sales or (2) by bypassing the cash registers entirely in actual sales transactions.   (H4 at 7, 26.)   Each of the individual defendants was identified as having participated in numerous instances of misrecording sales on the video footage.   (Ex. 48-56.)

37.     Pasarella testified to dozens of videotaped transactions which were shown to the Court over the course of the hearing.   These samples taken from the above-noted 26 hours of footage showed transactions conducted by defendants.   Each of the examples identified by 7-Eleven as fraudulent showed the defendant franchisees and employees respectively failing to properly record the sale of purchased items.

38.     This misreporting occurred through a variety of methods.   In certain circumstances an item was scanned and subsequently voided out, although the video showed the customer paying cash, being given change, and leaving with all his/her items. (See e.g., Ex. 49, Tr. 55.)   Other times, multiple items were scanned and the customer gave cash for the purchase, but the defendants aborted the transaction on the POS, such that the total amount recorded was zero. (See e.g., Ex. 50, Tr. 161.)   Additionally, defendants entered a "no sale" on the POS in situations where customers gave cash and left with their product.   (See e.g., Ex. 50,    Tr. 195.)   Defendants also made cash sales without using the cash register or otherwise recording the sales.   (See e.g., Ex. 48.)   The PLU key was also used in certain instances to scan items, such that the sale of those items was not properly recorded when the customer paid in cash and left with those items.   (See e.g., Ex. 54, Tr. 94.)   Finally, certain products were scanned and then the defendants entered Cancel Age Verification, recording no sale of product, although the video showed customers giving cash, receiving change, and leaving with their scanned products.   (See e.g., Ex. 56, Tr. 68.)

39.     Pasarella testified that in watching video where a sale had not been recorded properly, he "never saw anybody make any attempt to re-record the sale or actually ring it in

legitimately." (H1 at 158.)

H.    Hours and EBT Investigation

40.    Minaxi, on behalf of Minaxi Enterprises, regularly reported to 7-Eleven the hours worked by store employees each week, to facilitate 7-Eleven's processing of payroll.[4]    (H3 at 198.)   For instance, Minaxi reported that defendant Ayana had consistently worked in the store for 10 hours a week.   (Ex. 32).

41.    Nancy Tabeek, Asset Protection Specialist for 7-Eleven, testified at the hearing as to her investigation into the hours worked by certain employees in the store.   For instance, during the week of September 21, 2012, Tabeek observed defendant Ayana working in the store for approximately 39 hours, while Minaxi reported only 10 hours to 7-Eleven.   (H2 at 172); (Ex. 57.)

42.    Further, Tabeek observed two men identified by Minaxi as "Dereje" and "Eskinder" working at the store.   During the week of September 21, 2012, Tabeek observed those two men working for approximately 53 and 54 hours at the store, respectively.   However, Minaxi did not report these men as employees of the store, and did not report the hours they worked to 7-Eleven.   (Ex. 32, 57.)

43.    Pasarella also testified that Milind had fraudulently used the EBT machine. Pasarella described a register receipt from July 12, 2012 and accompanying video, as showing Milind scanning, then "backing out," and then re-entering a packet of cigarettes as a grocery non-tax item.   (H1 at 172.)   The amount charged for the grocery non-tax item equaled the cost of the packet of cigarettes plus 8% total sales tax.   (Id. at 173.)   These actions were allegedly performed so that the customer could use an EBT card to illegally purchase cigarettes. (Id. at 180-81.)

---

4 Store employees occasionally reported the hours worked by employees.   (H3 at 198.)

I.        Supplemental Notice

44.       Following 7-Eleven's investigation into hours reported by the store, as well as the discovery of the above EBT transaction, 7-Eleven issued a Supplemental Non-Curable Notice of Material Breach and Termination on November 16, 2012.   This notice again stated that the franchisee-defendants were having their franchise terminated immediately and were not entitled to notice or opportunity to cure, as a consequence of the hour and EBT violations.   (Ex. 35.)

J.        Milind Upadhyaya

45.       Milind testified at the hearing.   He has a Bachelor's degree from a school in India, and a Master's in Business Administration from West Texas University.   He and his wife Minaxi have been franchisees of 7-Eleven for approximately 23 years.   (H2 at 96.)   Prior to this case, 7-Eleven had not made any complaints regarding the operation of franchisee-defendants' store. (Id.)

46.       In his testimony Milind attempted to explain certain transactions identified by 7-Eleven as fraudulent.   Specifically store video from July 1, 2012 showed Milind recording a gallon of milk and two juice bottles on the POS, and then voiding out both juices.   However, on the video the customer is seen paying cash and leaving with the milk and both juices.   (H3 at 38.) Milind testified that the customer in the video is named Lance, a "good friend" who frequently patronizes the store.   (Id.)   Milind further stated that Lance had "some problem with the juices he bought . . . previous times . . . I said go, take those juices, please, just to create the good will because he has been a regular customer and I had to void these transactions."   (Id.)

47.       Milind did not offer this explanation during his deposition when he was shown the same video.   Milind stated at that time, "I have no idea" why the juices were voided, and added that he had no explanation for that action.   He speculated that it might have been a regular

customer who was complaining about something, but gave no actual explanation for the voiding of the juices. Further, at his deposition Milind never identified the customer as his "good friend" Lance. (Milind Dep. at 159.)

48. Also at the hearing, regarding the alleged EBT fraud, Milind stated that the EBT machine would not allow him to ring up the cigarettes on the "cash" portion of the EBT card, which allows the holder to use it to purchase non-food items. Milind claimed that this transaction was the only way to charge the cigarettes to the EBT card, and that such a purchase was legal. (H3 at 52.)

49. Milind also stated generally that he and others would sometimes place cash underneath the cash register screen, without opening the drawer, because "7-Eleven is sensitive about using no sales or void buttons. . . ." According to Milind, the money beneath the cash register screen was used to make change without opening the drawer. (H3 at 41.)

50. Milind testified that while "mistakes are made" during the operation of the store, he and his employees never intentionally defrauded 7-Eleven. (H3 at 31.)

K. <u>Minaxi Upadhyaya</u>

51. Milind's wife Minaxi also testified at the hearing. Minaxi graduated from high school in Texas, and attended a secretarial course for 2-3 years. (Minaxi Dep. at 8-9.)

52. Like her husband, Minaxi stated that her failure to properly record sales stemmed from inadvertent mistakes, because she may have been "tired or something" or it was "some kind of mistake [she] made before." (H3 at 136.)

53. However, Minaxi did not explain any of the videotaped transactions which involved her and were identified by 7-Eleven as fraudulent. 7-Eleven played several such transactions during Minaxi's testimony.

54.     For example, Minaxi admitted that video from June 22, 2012 showed her voiding out two items selected by a customer, even though the customer handed money to Minaxi and left the store with both items.   (Id. at 150-51.)   When asked if she had deliberately voided the merchandise, Minaxi responded, "I don't remember, I don't recall." (Id. at 152.)

55.     Similarly, Minaxi also admitted that the video from September 1, 2012 showed her scanning a pack of cigars, taking money from the customer, and making change, and the receipt for that transaction showed that she entered "No Sale," with the result that no amount was recorded in the POS for the sale.   (Id. at 186.)   When asked whether there was an explanation for her actions, Minaxi responded, "I don't know." (Id. at 187.)

56.     Finally, Minaxi admitted that footage from September 14, 2012 showed her recording on the POS two sodas and a danish selected by a customer, taking money from the customer, providing change and then aborting the transaction on the POS, and not recording any dollar amount for the sale.   (Id. at 195.)   When asked for an explanation, Minaxi responded by "guessing" that she might have made a "mistake before and . . . just tried to correct that one."   (Id.) When pressed as to why she would not simply correct that initial mistake, Minaxi responded only that she did not remember this transaction.   (Id. at 196.)

57.     Minaxi did attempt to explain the fact that certain employees appeared to be working more hours than she had reported to 7-Eleven.   She explained that she did not want to charge her employees to park in the store lot, and instead had them work longer hours as payment to park there.   (H3 at 202.)

58.     Further, both Minaxi and Milind testified that the men "Eskinder" and "Dereje" viewed on the footage were not employees.   Rather both franchisees testified similarly that these men were friends of store employees and often came to the store because they were simply "trying

to learn the skill to find a job . . . . "  See e.g., (H3 at 106, 204.)

59.     Finally, at her deposition Minaxi testified that she usually prepared the Daily Cash

Report of total cash sales for the day as recorded or rung up on the cash register, sales made by

credit cards, and sales of money orders.   (Minaxi Dep. at 34.)   Minaxi agreed that the purpose of

the Cash Report was to match the cash actually received in a given day with the amount recorded

on the POS.   (Id. at 198-99.)   She stated that she had never found more money in the register than

the amount recorded on the POS. (Id. at 199.)   Minaxi also stated that the Cash Report always

balanced.   (Id.)

L.      Temporary Restraining Order

60.     By agreement of the parties, on October 10, 2012, the Court granted Plaintiff's

Motion for a Temporary Restraining Order.   Under the Order defendants were restrained from:

Failing to cause all sales of inventory to be properly recorded; Failing to use electronic equipment

to scan all products capable of being scanned; Failing to turn over to 7-Eleven all receipts for the

preceding 24-hour period (with certain exceptions); Failing to furnish 7-Eleven daily summaries

of purchases of inventory; Failing to furnish 7-Eleven timely copies of invoices for all purchases;

Removing any inventory from the stores other than in the ordinary course of business; Removing

or destroying any store-related records.   Defendants were also ordered to preserve all documents

concerning this action.   (Order of October 11, 2012, Document No. 13.)

61.     The Order provided that it would remain in effect until the Court ruled on the

Motion for a Permanent Injunction.

## III.    LEGAL STANDARD

Under the Lanham Act, the Court has the "power to grant injunctions, according to the

principles of equity and upon such terms as the court may deem reasonable, to prevent the

violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . . " 15 U.S.C. § 1116. "In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)." Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc., 747 F.2d 844, 850 (3d Cir.1984). Further, "[a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

The Franchise Agreement states that it is to be construed and interpreted under Pennsylvania law, and the parties do not contest this issue. Under state law, even where a contract sets forth provisions allowing notice and opportunity to cure upon a breach, "when there is a breach of contract going directly to the essence of the contract . . . the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary . . . ." LJL Transp., Inc. v. Pilot Air Freight Corp., 599 Pa. 546, 567 (2009).

IV.     CONCLUSIONS OF LAW

7-Eleven requests a permanent injunction due to trademark infringement. By remaining in the store after the Franchise Agreement has terminated, 7-Eleven argues that franchisee-defendants continue to use 7-Eleven trademarks, trade dress, and trade names in a manner likely to cause confusion among consumers. However, in order to establish a claim of trademark infringement, 7-Eleven must first show that the Franchise Agreement was properly

terminated.   See S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992) (holding

that alleged trademark infringement by franchisee required prior finding that the franchise

agreement was properly terminated).   That is, if the Agreement was not properly terminated,

franchisee-defendants retain authorization to use 7-Eleven's trademarks and other designations,

and no claim for trademark infringement can lie.

Defendants argue that the Agreement was not properly terminated because they were

entitled to notice and opportunity to cure their alleged breaches.   To show that it properly

terminated the Agreement, 7-Eleven must thus demonstrate that such notice was not required.

The Court addresses the propriety of the termination of the contract before turning to the equitable

factors relevant to the motion for permanent injunction.

A.      Notice and Opportunity to Cure

A contract may be terminated without notice and opportunity to cure in specific

circumstances, even where contractual provisions require such notice.   LJL Transp., Inc. v. Pilot

Air Freight Corp., 599 Pa. 546 (2009).   Notice and opportunity to cure provisions are not

enforceable where a breach goes "directly to the essence of the contract, which is so exceedingly

grave as to irreparably damage the trust between the contracting parties."   Id. at 567.

7-Eleven claims that defendants' fraudulent conduct constituted a breach that went to the

essence of the Franchise Agreement.   Thus, according to 7-Eleven, no notice and opportunity to

cure was required to terminate the contract, despite the language of the Franchise Agreement

allowing for such notice in numerous circumstances.   Defendants in response claim that 7-Eleven

has not proven fraud, and that no breach going to the essence of the contract has been shown.

The Court finds there is more than sufficient evidence of fraud in this case to warrant

termination of the contract without notice or opportunity to cure, because the fraud goes "directly

to the essence of the contract . . . . " <u>See id.</u>; <u>see also</u> <u>Southland Corp. v. Froelich</u>, 41 F. Supp. 2d 227, 247 (E.D.N.Y. 1999) (finding that fraudulent actions by 7-Eleven franchisee "go to the root of the matter or essence of the contract.")

B.      <u>Fraud</u>

Under Pennsylvania law, "[t]he essence of fraud is a misrepresentation fraudulently uttered with the intent to induce the action undertaken in reliance upon it, to the damage of its victim." <u>Presbyterian Med. Ctr. v. Budd</u>, 832 A.2d 1066, 1072 (Pa. Super. Ct. 2003). State courts have described the elements of fraud as: "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance." <u>Bortz v. Noon</u>, 556 Pa. 489, 499 (Pa. 1999). Each of these elements must be proven by clear and convincing evidence established by the moving party. <u>Rohm & Haas Co. v. Cont'l Cas. Co.</u>, 566 Pa. 464, 476 (Pa. 2001). "For the evidence to be clear and convincing, the witnesses must be credible. This means that the witnesses must both distinctly remember the facts to which they testify, and narrate the details exactly." <u>Pittsburgh Live, Inc. v. Servov</u>, 615 A.2d 438, 441 (Pa. Super. 1992). However, "fraud is never proclaimed from the housetops . . . So fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances." <u>Rohm & Haas Co.</u>, 566 Pa. at 476-77.

The Court need not address all of the above-noted elements as defendants claim only that there is no evidence they knew or were reckless as to the unrecorded and under-recorded sales, and no evidence that they intended to mislead or defraud 7-Eleven. The Court disagrees. At the hearing 7-Eleven presented substantial evidence of defendants' repeated failure to properly record

sales over a period of several months.   There are four general categories of such evidence: (1) over-use of certain "high risk" POS transactions, (2) failure of numerous "secret shops" conducted by 7-Eleven, (3) video from inside the store showing rampant misreporting of sales, and (4) significant discrepancies between reported sales and inventory purchased by the store.   James Pasarella testified with precise detail regarding each of the above findings, and described videotaped transactions evidencing fraud in franchisee-defendants' store.   In his testimony, Pasarella compared many of the videotaped transactions with the exact POS receipts that were created from each purchase, demonstrating that defendants received money in each of these instances, as shown on the video, while not recording the sale on the POS.   Defense counsel failed to impeach any of Pasarella's testimony regarding the defendants' failure to accurately record sales.

In sum, for a randomly selected period of 26 hours, approximately one-third of the transactions at the store were not properly recorded on the POS.   (H4 at 7, 26.) Franchisee-defendants aver that these dates were somehow deliberately selected by 7-Eleven. This argument is contradicted by Pasarella's testimony that the original dates were determined by randomly selecting examples of fraudulent transactions, and that such transactions were representative of the video reviewed by 7-Eleven.   (H1 at 104).   Defendants submitted no evidence supporting the contention that those dates were not representative of all transactions recorded on the DVR.

Franchisee-defendants offered few specific explanations of the evidence of their repeated failure to properly record sales.   Milind and Minaxi both stated that failure to properly record sales stemmed from "mistakes."   Minaxi speculated that she may have been "tired or something" or it was "some kind of mistake [she] made before." (H3 at 136.)   Of the dozens of transactions

shown to the Court identified as fraudulent by 7-Eleven, and of the hundreds more designated as such in 7-Eleven's in-depth review, franchisee-defendants only attempted to explain their actions in a few transactions. For instance, Milind stated that he voided out juices from the POS for his "good friend" Lance, because he had "some problem with the juices he bought . . . previous times." (H3 at 38.)

Further, when Minaxi was confronted with store video showing her voiding out items and accepting money from a customer who left with the merchandise, she was evasive and offered no explanation. When asked if she had deliberately voided the merchandise, Minaxi responded, "I don't remember, I don't recall." (H3 at 152.) This pattern of failing to offer any explanation of her actions was repeated several times at the hearing. (Id. at 162, 178, 187.) Minaxi's most detailed explanation of her failure to record sales amounted to "guessing" that she might have made a "mistake before and . . . just tried to correct that one." (Id. at 195.) When pressed as to why she would not simply correct that initial mistake, Minaxi responded only that she did not remember the transaction at issue. (Id. at 196.)

The Court concludes that franchisee-defendants' testimony, to the extent that it offers any explanation for their actions, is not credible. The Court rejects the argument that the rampant failures to record sales stemmed merely from "mistakes" of the franchisees who had operated a 7-Eleven store for 23 years. Further, 7-Eleven presented voluminous evidence painstakingly assembled from store video and POS data, which showed defendants repeatedly failing to record sales on several days over a period of months. Despite being provided with the store video, and having viewed numerous transactions identified by 7-Eleven as fraudulent at their depositions over a month before the hearing, franchisee-defendants failed to credibly explain such misrecording and under-recording.

In addition, as noted above, Minaxi testified at her deposition that she generally prepared the Daily Cash Report. (Minaxi Dep at 34.) The Cash Report sets forth the total sales for the day as recorded or rung up on the cash register, and sales made with credit cards and sales of money orders. Minaxi agreed that the purpose of the Cash Report was to match the cash actually received in a given day with the amount recorded on the POS. (Id. at 198-99.) Milind also stated that money received from all sales, even from those improperly recorded, would be deposited in the cash register (or store safe), and Minaxi confirmed that she reported to 7-Eleven all of the money received by the store each day. (H3 at 86, 137.) Minaxi also claimed that she had never found more money in the register than the amount recorded on the POS. (Minaxi Dep. at 199.) Both Minaxi and Pasarella testified that the Cash Report always balanced and did not show any amount of cash which exceeded that reported on the POS ("overage"). (Id.; H2 at 129.)

Franchisee-defendants' assertions, that all money received was deposited in the register and reported to 7-Eleven, are impossible to reconcile with the abundant evidence of unrecorded and under-recorded sales. The Court viewed numerous videotaped transactions where customers gave money to the defendants and exited the store with merchandise, but the sale was not properly recorded in the POS. If, as franchisee-defendants claimed, the cash received in all transactions was deposited in the register, misrecorded transactions would necessarily result in a greater amount of money in the register than was documented on the POS. Under those circumstances Minaxi would have been required to report to 7-Eleven an overage of cash representing the difference. Yet, both Minaxi and Pasarella noted that the daily Cash Reports always balanced.[5]

The Court concludes that this evidence further supports 7-Eleven's contention that

---

[5] Milind testified that he would sometimes ring up transactions after the customer had left and thus record transactions that had not been initially entered on the POS. However, Pasarella testified that he never saw the defendants "make any attempt to re-record [a] sale or actually ring it in legitimately." (H1 at 158.) Further, despite having access to the store video as well as the POS data, Milind presented no evidence that such subsequent recording ever took place. (H3 at 75.) Thus, the Court does not credit Milind's testimony that he subsequently entered misrecorded sales.

defendants knowingly failed to record sales and were intentionally misleading in their Daily Cash Reports.   If defendants' failure to record sales on the POS was simply the product of mistakes, and the money from all transactions was deposited in the cash register or store safe, the money received in misrecorded sales would be reflected in an overage in the Daily Cash Report. However, as no overage was ever reported, the Court concludes that defendants knew of the misrecorded sales and did not report the money received in such transactions.   In other words, the evidence establishes that the defendants must have counted more money in the register and store safe than was recorded on the POS, and did not report it to 7-Eleven.   Defendants thus intentionally falsified the Daily Cash Reports and sought to mislead 7-Eleven.

In sum, 7-Eleven's evidence establishing widespread misrecording of sales and cash reports, and defendants' failure to offer any credible, innocent explanation as to such actions, confirms that defendants acted with knowledge that they were not properly recording sales on the POS, and they intended to mislead 7-Eleven as to the records of those sales.   The Court thus concludes that 7-Eleven has proven all elements of fraud by clear and convincing evidence, and that the fraudulent actions of the defendants constituted a "breach going to the essence of the contract."[6]   LJL, 599 Pa. at 567.   Defendants' fraudulent actions served to destroy all trust between themselves and 7-Eleven, and the Court finds "that requiring . . . notice before termination under such circumstances would be a useless gesture, as such a breach may not reasonably be cured."   See id.; see also Froelich, 41 F. Supp. at 247; Southland Corp. v. Mir, 748 F.Supp. 969, 984 (E.D.N.Y. 1990).   Consequently, the September 28, 2012 termination of the Franchise Agreement without any notice or opportunity to cure was proper, and the Agreement was terminated as of that date.

---

6 Because the Court concludes that the fraud relating to store sales constitutes a breach sufficient to justify termination of the Franchise Agreement without notice and opportunity to cure, the Court need not address 7-Eleven's arguments regarding alleged breaches relating to employee hours and EBT fraud.

C.    Permanent Injunction

      1.    Success on Lanham Act Claim

"In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)." Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc., 747 F.2d 844, 850 (3d Cir.1984).   7-Eleven's trademark infringement claim requires a showing that the defendants' unauthorized use of 7-Eleven's valid trademarks is likely to cause confusion.   18 U.S.C. § 1114(1).   "A franchisee's use of the franchisor's marks is unauthorized if the franchisor properly terminated the franchise agreement." 7-Eleven, Inc. v. Dhaliwal, 2012 WL 5880462, at *5 (E.D. Cal. Nov. 21, 2012).   The Court having concluded that the Agreement in this case was terminated properly, defendants' use of 7-Eleven's trademarks is unauthorized.

A likelihood of confusion exists where "the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."   Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994).   Accordingly, "there is a great likelihood of confusion when an infringer uses the exact trademark as the plaintiff."   S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 375 (3d Cir. 1992); Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990) (same).   Franchisee-defendants do not dispute that they continue to utilize 7-Eleven's exact trademarks, trade names, and trade dress.   Accordingly, the Court concludes that there is a substantial likelihood of confusion on the part of consumers as to franchisee-defendants' affiliation with 7-Eleven.   7-Eleven has therefore demonstrated actual success on the merits of its trademark infringement claim.

2.       Irreparable Harm and Unavailability of Remedies at Law

The Court next turns to the factors to be considered in ruling on a motion for a permanent injunction.   The Court considers the first two factors together: whether franchisee-defendants' possession of the store would cause irreparable injury to 7-Eleven, and whether remedies available at law, such as monetary damages, are inadequate to compensate for that injury.   eBay Inc., 547 U.S. at 391.

The Third Circuit has previously held that a showing of trademark infringement alleges irreparable injury as a matter of law.   See S & R Corp., 968 F.2d at 378.   However, in eBay the Supreme Court held that permanent injunctions should not automatically issue upon a showing of patent infringement.   Id. at 392-93.   Lower courts have subsequently held that eBay may bar presumptions of irreparable harm based upon a showing of trademark infringement, instead requiring a specific finding of irreparable harm under the facts of each case.   See e.g., Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc., 704 F.3d 44, 54 (1st Cir. 2013) (noting, without deciding, that eBay may bar presumption of irreparable harm in trademark infringement cases); N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir. 2008) (same).   The Third Circuit has not yet addressed eBay as it affects injunctions for trademark infringement.   However, even if irreparable injury may not be based solely on a finding of trademark infringement, the Court concludes that 7-Eleven has made a sufficient showing of irreparable injury.   See Opticians Ass'n, 920 F.2d at 196; S & R Corp., 968 F.2d at 378.

Where a plaintiff demonstrates the loss of control as to its trademarks, such loss of control "creates the potential for damage to [plaintiff's] reputation."   Opticians Ass'n, 920 F.2d at 196. Further, "[p]otential damage to reputation constitutes irreparable injury . . . ."   Id.   As franchisee-defendants continue to operate the store after the Franchise Agreement has been

terminated, 7-Eleven has lost control of those trademarks in and relating to franchisee-defendants'

store. There is clear potential for damage to 7-Eleven's trademarks as, for instance, defendants

are no longer bound by the Franchise Agreement regulating store operations. See S & R Corp.,

968 F.2d at 378 (finding irreparable harm to reputation even if trademark "was being put to better

use" by ex-franchisee). The Court finds that 7-Eleven has shown irreparable injury resulting from

loss of control of its marks, which cannot be compensated for in monetary terms. Id. (noting that

"[i]irreparable harm must be of a peculiar nature, so that compensation in money alone cannot

atone for it.").

The Court also concludes that 7-Eleven has established irreparable injury stemming from

defendants' continued occupancy of the store and interfering with 7-Eleven's property rights.

Interference with the real property of another may constitute irreparable harm due to the unique

opportunities offered by certain real property. See Minard Run Oil Co. v. U.S. Forest Serv., 670

F.3d 236, 256 n.14 (3d Cir. 2011) (collecting cases). "Irreparable harm in this context flows from

the owner's inability to make better use of the site, or the owner's lack of control over features,

fixtures, and equipment located on the site." Southland Corp. v. Froelich, 41 F. Supp. 2d 227, 242

(E.D.N.Y. 1999). In this case, defendants' continued occupancy of the store, after the termination

of the Franchise Agreement, has caused, and will continue to cause, irreparable harm because

7-Eleven may no longer make productive use of its property. See Dhaliwal, 2012 WL 5880462,

at *6 (E.D. Cal. Nov. 21, 2012).

    3.    Balance of Hardships

The next factor in the permanent injunction analysis requires weighing hardships to the

parties. Franchisee-defendants claim that the entry of an injunction would result in the loss of

their livelihoods. However, "the injury a defendant might suffer if an injunction were imposed

may be discounted by the fact that the defendant brought that injury upon itself." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir. 2004). The Third Circuit has held that, "a different rule would allow a knowing infringer that constructs its business around its infringement to avoid an injunction by claiming it would have a devastating effect on that business, a result we cannot condone." Id. at 729 (internal quotations omitted).

Defendants, who have been found to have committed fraud by the Court, may not now complain of an injunction that results from their misconduct. Any cognizable hardship to defendants is "outweighed by the immeasurable damage done" to 7-Eleven, through the loss of control over its trademarks, as well as interference with its property. See Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 806 (3d Cir. 1998). The Court concludes that this factor also weighs in 7-Eleven's favor.

4.      Public Interest

The final factor is whether the public interest would not be disserved by a permanent injunction. eBay Inc., 547 U.S. at 391. The public's general interest in the prevention of fraud would be aided by the entry of an injunction here. See F.T. Int'l, Ltd. v. Mason, 2000 WL 1514881, at * 2 (E.D. Pa. Oct. 11, 2000) ("[T]he prevention of unjust enrichment by means of fraud or misappropriation, even that affecting only private entities, is in the general public interest"); Marsellis-Warner Corp. v. Rabens, 51 F. Supp. 2d 508, 533 (D.N.J. 1999) (finding that injunctive relief "clearly serves the public interest in preserving the strict fiduciary duty owed employers by employees"). Further, an injunction would aid in the future accurate disclosure of sales and consequently the proper collection of taxes by the state and federal government. The Court agrees with 7-Eleven that the entry of a permanent injunction would serve the public interest.

D.    Unclean Hands

Defendants claim that 7-Eleven has acted in bad faith and thus has "unclean hands," precluding the entry of a permanent injunction.    "The doctrine of unclean hands, named for the equitable maxim that 'he who comes into equity must come with clean hands,' is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."   Karpenko v. Leendertz, 619 F.3d 259, 265 (3d Cir. 2010).   Defendants claim that 7-Eleven acted in bad faith by failing to provide notice and opportunity to cure the contractual breaches at issue, by disabling the Lottery machine, and removing the money order and EBT machines from the store.   The Court rejects defendants' argument.

Having previously concluded that defendants breached the Franchise Agreement through fraudulent conduct, 7-Eleven was entitled to terminate the Agreement without notice or opportunity to cure.   Accordingly, such termination did not constitute bad faith.   Further, as defendants were no longer franchisees as of September 28, 2012, they were not entitled to operate the store or any of the equipment in the store as of that date.   7-Eleven's shut-down or removal of various machines was therefore not in bad faith.   The Court concludes that defendants have not asserted a valid defense to the entry of a permanent injunction and that such an injunction should issue.

V.    **CONCLUSION**

As noted above, each of the equitable factors considered weigh in 7-Eleven's favor.   First, 7-Eleven has demonstrated actual success on the merits of its trademark infringement claim.   Second, 7-Eleven has established irreparable injury that cannot be compensated by money damages.   Third, any cognizable harm to defendants resulting from a permanent injunction is

outweighed by the harm to 7-Eleven if an injunction is not granted.    Fourth and finally, the public interest will be served by a permanent injunction.[7]

For the foregoing reasons, the Court grants 7-Eleven's Motion for Permanent Injunction. An appropriate order follows.

---

[7] The parties did not brief the question of whether the Court should order a bond in favor of franchisee-defendants covering their investment in inventory and other assets.    The Court concludes under the circumstances of this case that a bond is not required.